# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| DARLENE LOUDY, *on behalf of* C.L.L., | CASE NO. 5:21-cv-00524 |
| Plaintiff, | DISTRICT JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. |  |

Plaintiff Darlene Loudy ("Plaintiff" or "Ms. Loudy") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") on behalf of her minor grandchild, C.L.L. (ECF Doc. 1, ECF Doc. 15 p. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.  Procedural History

On May 21, 2018, Ms. Loudy protectively filed an application for children's SSI on behalf of her grandchild C.L.L., with an alleged disability onset date of March 1, 2015.  (Tr. 9, 63, 144-49, 156.)  She alleged C.L.L. was disabled due to speech and learning issues.  (Tr. 64, 78, 85, 157.)  The application was denied at the initial level (Tr. 75-79) and upon reconsideration

1

(Tr. 83-86), and she requested a hearing (Tr. 87-89).  On January 9, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 22-55.)

On June 16, 2020, the ALJ issued a decision finding C.L.L. was not under a disability within the meaning of the Social Security Act since May 21, 2018, the date the application was filed.  (Tr. 6-21.)  On January 6, 2021, the Appeals Council denied Ms. Loudy's request for review, making the ALJ decision the final decision of the Commissioner.  (Tr. 507-13.)

## II. Evidence

### A.    Personal Evidence

C.L.L. was born in 2010.  (Tr. 10, 144.)  Under Social Security regulations, he was a school-age child at the time the application and at the time of the ALJ's decision.  (Tr. 10.)

### B.    Medical and Educational Evidence

#### 1.    Educational and Treatment Records[1]

C.L.L.'s primary care physician was Paul Schuh, M.D., at Akron Children's Hospital ("Akron Children's"). (Tr. 398.)  C.L.L. saw other medical providers at Akron Children's, including speech-language pathologists and occupational therapists.

Beginning at least in early April 2017, and continuing through at least November 2018, C.L.L. generally attended weekly speech-language therapy sessions.  (Tr. 288-291, 295-97, 298-300, 302-303, 306-13, 315-22, 327-34, 335-338, 365-98, 401-07.)  He initially received therapy services through speech-pathologist Kristen Lautenbach, M.S. CCC-SLP, but in August 2017 he started seeing speech-pathologist Cameron Tezanos, CCC-SLP.  (Tr. 288-91, 295-97, 298.)  During a January 8, 2018, therapy session, SLP Tezanos observed "[g]ood participation . . .

---

[1] During the hearing, Ms. Loudy's counsel raised an issue regarding C.L.L.'s school's lack of response to requests for records.  (Tr. 34-35.)  The ALJ indicated that they would issue a subpoena.  (Tr. 35, 53-55.)  As noted in the ALJ's decision, the ALJ sent subpoenas but there was no response.  (Tr. 9.)  Ms. Loudy's counsel was contacted and indicated the record was complete and ready for adjudication.  (*Id*.)

throughout [the] session" but noted that C.L.L.'s "conversational intelligibility [was] still below age expectation."  (Tr. 312.)

On April 12, 2018, C.L.L. attended an occupational therapy evaluation conducted by occupational therapist Beth Heindel, OTR/L, with concerns in the following areas noted: delays in fine motor and visual motor skills, handwriting, decreased postural control for age, and decreased strength and tone in the bilateral upper extremities.  (Tr. 322-26.)  OT Heindel administered standardized testing.  (Tr. 324.)  She found that C.L.L.'s Developmental Test of Visual Motor Integration's (VMI) testing revealed "average visual motor coordination and motor coordination for [his] age range, 8 yr 1 mth."  (Tr. 325.)  She also indicated that C.L.L. had "above average visual perceptual skills according to the VMI."  (*Id*.)  On examination, C.L.L.'s bilateral upper extremity range of motion was slightly decreased against resistance and he used "compensatory movements of his trunk."  (Tr. 324.)  C.L.L.'s sensation was within normal limits.  (Tr. 325.)  His tone was decreased throughout his body and his elbows were hyperextended.  (Tr. 324.)  C.L.L. exhibited right-hand dominance, and "use[d] a modified dynamic to static tripod grasp alternating between a neutral wrist and a hooked/flexed wrist [and] [h]e use[d] excessive pressure for control when writing and frequently need[ed] rest breaks." (Tr. 324-25.)  C.L.L.'s handwriting was "often completed from the bottom up and clockwise rather than counterclockwise" and he had "overflow movements with his tongue and mouth" when writing.  (Tr. 325.)  His endurance was fair but he "frequently slump[ed] over the table resting his head on his hands."  (*Id*.)  He was independent with mobility but exhibited "[d]ifficulty with bilateral coordination skills," had "difficulty with understanding motor planning verbally," and "need[ed] demonstration for motor patterns."  (*Id*.)  He "show[ed] good

3

attention to people and activities." (*Id.*)  OT Heindel recommended occupational therapy two to four times per month for six months. (*Id.*)

On May 2, 2018, a hearing screening was conducted by Carin Delzoppo CNP at Akron Children's due to C.L.L.'s speech delays.  (Tr. 326-27.)  CNP Delzoppo explained that no further hearing evaluation was required since C.L.L. passed the hearing screening, but recommended that he continue with his speech therapy.  (Tr. 326.)

During an October 8, 2018 speech-language therapy session, SLP Tezanos discussed a "comprehensive developmental evaluation" because Ms. Loudy raised "several concerns for [C.L.L.'s] development that [had] not been explored."  (Tr. 388.)  During a speech-language therapy session on November 5, 2018, Ms. Loudy asked about a "developmental evaluation" and SLP Tezanos encouraged her to discuss her concerns with C.L.L.'s primary care physician.  (Tr. 397-98.)  Ms. Loudy also expressed frustrations with what the school was reporting C.L.L. could do and what he could do at home.  (Tr. 398.)

During a November 6, 2018 appointment with Dr. Schuh, Ms. Loudy reported that C.L.L. had services in place, including an IEP at school for speech delays, speech services at school, individual speech therapy at Akron Children's, and occupational therapy at Akron Children's, but she did not feel he was doing as well as she would expect.  (Tr. 400.)  Dr. Schuh placed a referral to developmental pediatrics.  (Tr. 398, 400.)

On December 19, 2018, the Akron Public Schools conducted a reevaluation to determine the continued need for special education services and completed an Evaluation Team Report ("ETR").  (Tr. 461-98.)  The prior ETR was dated April 19, 2016.  (Tr. 461.)  School psychologist Kathleen Klamut chaired the evaluation.  (Tr. 464-65.)  Other team members were Ms. Loudy, speech and language pathologist Anne Maholm, occupational therapist Saundra

Gordon, general education teacher Carrie Musci, intervention specialist Elena Gibbons, and district representative Jeff Lysiak.  (Tr. 465, 496.)  During the evaluation, C.L.L. completed all required tasks and his conversational proficiency was typical for his age level.  (Tr. 467.)

As part of the ETR reevaluation, the Wechsler Intelligence Scale for Children-Fifth Edition (WISC-V) test was administered, producing a Full-Scale IQ (FSIQ) score of 87, noted to be in the low average range compared to other children his age.  (*Id*.)  Other test scores were: Verbal Comprehension Index – 89 (low average range); Visual Spatial Index – 100 (average range); Fluid Reasoning Index – 91 (average range); Working Memory Index – 79 (very low range); and Processing Speed Index – 98 (average range).  (Tr. 467-68.)  School psychologist Klamut noted that C.L.L.'s low Working Memory score suggested that he might "experience difficulty with retaining, recalling and repeat[ing] information, attention/concentration, sequencing skills, rote learning, organization, visual and auditory short-term memory, [and] conceptualization."  (Tr. 469.)  The Woodcock-Johnson Standardized Tests of Achievement – IV was also administered, providing RPI (Relative Proficiency Index) scores.  (Tr. 472-74.)  School psychologist Klamut indicated that C.L.L.'s RPI scores "suggest[ed] he [would] need special assistance to complete reading and written expression tasks within his instructional zone."  (Tr. 474.)  She explained that C.L.L.'s "reading miscues and poor decoding skills [had] an adverse effect on his reading comprehension," his fluency and comprehension were limited because he "read[] in a choppy and laborious fashion," and "[h]is difficulty with spelling [might] impede his ability to express himself in a written format."  (*Id*.)  Further, she explained that C.L.L.'s "[d]eficient reading and spelling/writing skills [would] make it difficult for [him] to access the general education curriculum without assistance" and therefore he might need "[s]pecially designed instruction focused on specific skills in reading and language arts," "tests and materials

read to him" and other "testing accommodations," including "frequent breaks," "a small group

setting," or "[e]xtra time to complete academic tasks and quizzes/tests." (*Id*.)

School psychologist Klamut also evaluated C.L.L. based on observations, interviews, and

school records, which included his teacher's observations that "most social/emotional skills

[were] appropriate" and C.L.L. was able to "work independently, follow[] classroom rules,

respond[] appropriately to redirection or correction and transition[] or adapt[] to new situations,"

but "[a]t times, he handle[d] frustration in an inappropriate manner by 'melting down.'" (Tr.

478; *see also* Tr. 487, 490 (reflecting that C.L.L.'s regular teacher commented that C.L.L.

showed resistance about once each week in response to directions from teacher's other than her,

but the occurrences were decreasing).)  Thus, it was noted that C.L.L. "would benefit from

increasing his skills for self-regulation when upset." (*Id*.)  The ETR also reflected C.L.L.'s

teacher's observations that his fine and gross motor skills appeared grade-level appropriate. (Tr.

479.)  School psychologist Klamut reported that C.L.L. did not appear to need "any specific

educational assistance in the areas of assessed for fine/gross motor, social/emotional, [or]

vision/hearing." (*Id*.)  Ms. Loudy reported on an evaluation form that C.L.L. was "kind,

considerate, polite . . . passive, [a] peace maker, [and] gentle soul." (Tr. 480.)  She reported

concern about C.L.L. being bullied. (Tr. 480, 481.)

As part of the reevaluation for his ETR, speech-language pathologist Anne Maholm

conducted testing on multiple days in October 2018. (Tr. 483-84.)  As part of her assessment,

she interviewed Ms. Musci on November 7, 2018. (Tr. 484.)  During that interview, Ms. Musci

reported that C.L.L. was "doing very well academically in [her] class." (Tr. 484.)  She also

stated that C.L.L.'s strengths were math and teamwork, and he was able to work with "any

student and get along with any student." (*Id*.)  However, while C.L.L. was "becoming a stronger

reader, writing and spelling [were] still a struggle." (*Id*.)  Ms. Musci reported having no

"concerns regarding [C.L.L.'s] articulation and intelligibility." (*Id*.)  Based on SLP Maholm's

testing, observation, interview with Ms. Musci, and record review showing "a significant

improvement [in][C.L.L.'s] overall core language and expressive language capabilities," SLP

Maholm opined that C.L.L.'s "test scores yield[ed] average to low-average language skills when

compared to the same-aged peers," and he needed "to continue to develop his expressive,

receptive, vocabulary, and language memory skills in a general education environment," he

needed "verbal repetition and auditory highlighting of key information," and he needed "to

continue to self-monitor and self-correct his articulation skills." (Tr. 484.)

        Occupational therapist Saundra Gordon also evaluated C.L.L. as part of the ETR

reevaluation. (Tr. 485.)  Her evaluation was based on interviews with his general education

teacher and intervention specialist, observations in the school environment, and testing. (*Id*.)

C.L.L.'s general education teacher and intervention specialist reported no fine/visual motor

concerns. (*Id*.)  OT Gordon observed that C.L.L. was able to complete all adult-directed tasks,

but appeared to rush at times and frequently changed sitting positions. (*Id*.)  He scored in the

average range for all Wide Range Assessment of Visual Motor Abilities (WRAVMA) subtests.

(*Id*.)  He was administered the Evaluation Tool of Children's Handwriting (ETCH) used to

evaluate "legibility, recall, dictation, near and far copying and sentence composition." (*Id*.)  His

scores on various handwriting tests ranged from 72% to 88%, with mastery generally "80% of a

given written task." (Tr. 485-86.)  The conclusion was that C.L.L. had "the fine and visual

motor skills necessary to be successful in the educational environment," but he "need[ed] to

increase his attention to task and use a more efficient grasp on a writing utensil to consistently

demonstrate legible handwriting." (Tr. 486.)

C.L.L.'s general education teacher Carrie Musci also provided an assessment of C.L.L.'s abilities as part of the ETR reevaluation.  (Tr. 488-89.)  She reported that C.L.L. was able to perform most social/emotional and academic tasks all the time.  (*Id*.)  In four areas – respond appropriately to redirection or correction, handle frustration in an appropriate manner for age level, reading decoding/work recognition at grade level, and reading comprehension at grade level – she noted that C.L.L. could "usually" perform the task.  (*Id*.)  She reported C.L.L. was "approaching mastery at majority of standards this marking period."  (Tr. 489.)  She explained that the "bigger issue" was his ability to spell, but that he did not need things repeated, always followed directions the first time, and was able to complete assignments on time.  (*Id*.)  She indicated that his "reading level ha[d] grown from a G to an I as he continue[d] to work on his comprehension and fluency."  (*Id*.)

The evaluation team concluded that C.L.L. "continue[d] to qualify for special education services as a student with a Specific Learning Disability . . . in the areas of: Basic Reading Skill, Reading Comprehension, Reading Fluency and Written Expression."  (Tr. 495, 497.)  It was further concluded that the noted deficits "adversely impact[ed] [C.L.L.'] educational functioning" and "suggest[ed] he [would] have difficulty keeping up with the demands of the general education curriculum."  (Tr. 495.)  Ms. Loudy agreed with and signed the ETR, but indicated that C.L.L. continued to need speech and language and occupational therapy and would have those services provided through Akron Children's.  (Tr. 495, 497.)

On April 15, 2019, C.L.L. presented for an occupational therapy reevaluation conducted by Jaime E. Bass, MOT, OTR/L, with concerns in the following areas noted: delays in fine motor and visual motor skills, decreased postural control for age, tactile sensitivities, decreased tactile, auditory, vestibular, proprioceptive, and visual processing, decreased strength and tone in the

bilateral upper extremities, and delays in daily living skills.  (Tr. 247-54.)  C.L.L. was reported to be independent in activities of daily living, except he required assistance with bathing for thoroughness, buttoning/unbuttoning pants, and tying his own shoes.  (Tr. 248.)  OT Bass administered motor proficiency standardized testing that resulted in "average" test results.  (Tr. 248-49.)  OT Bass reported results of a Sensory Processing Measure Home Form, a parent questionnaire intended to assess a child's sensory processing.  (Tr. 249.)  The results were typical for social participation, vision, body awareness, balance and motion, and planning and ideas, but with some problems noted in hearing and touch.  (*Id.*)

On examination, C.L.L.'s bilateral upper extremity range of motion was normal but his upper extremity strength was decreased.  (Tr. 249.)  His tone was decreased in the trunk and bilateral upper extremities.  (*Id.*)  C.L.L. exhibited right-hand dominance with some limitations in hand skills.  (Tr. 250.)  Visual motor skills and vision and visual perceptual skills were unimpaired.  (*Id.*)  He was independent with functional mobility/ambulation but exhibited some limitations with postural control.  (*Id.*)  He exhibited good attention to people and activities, good eye contact, good safety awareness and judgment, was cooperative during the evaluation, and was able to follow multi-step direction although Ms. Loudy reported that he had difficulty executing bathing steps.  (*Id.*)  He was fidgety, frequently rubbed and scratched his nose, chewed on a bottle top, often sought out tactile input, and had difficulty sitting when completing table-top activities.  (Tr. 251.)  OT Bass recommended weekly occupational therapy sessions and felt that C.L.L.'s treatment prognosis was good.  (Tr. 254.)

On August 8, 2019, a reading diagnostic assessment was conducted.  (Tr. 245-46.)  C.L.L. was in fourth grade.  (Tr. 245.)  He was assessed with kindergarten level skills in phonics, first grade level skills in high frequency words and comprehension-literature, and second grade

level skills in vocabulary and comprehension-informational text, with an overall reading diagnostic level of first grade.  (Tr. 245-46.)  A fourth-grade interim progress report dated August 27, 2019 showed C.L.L.'s study skills and social skills were satisfactory, but his math, reading, and language arts were below average. (Tr. 244.)  He had one excused absence and no unexcused absences or tardies.  (*Id*.)

An October 4, 2019 IEP Progress Report (Tr. 277-81) reflected that C.L.L. still had room for growth in math but he was making "great progress."  (Tr. 277.)  His reading skills were still not at grade level but he was making "great growth."  (Tr. 278.)

In an undated "Fourth Grade Standards Based Interim Report Rubric" for 2019-2020, C.L.L.'s fourth-grade teacher Krysten Bonacci rated C.L.L. as "approaching mastery" in nineteen of the twenty-one categories rated and rated him as having mastered two categories, adding the following comments:

> [C.L.L.] is a phenomenal student!  He works so hard every day and his hard work shows with his grades.  [C.L.L.] needs to continue to work on Perseverance when he gets frustrated because he sometimes shuts down.  However, this is a pretty rare occasion and most of the time, he demonstrates his exceptional ability to be a Perpetual Learner.

(Tr. 283-84.)

On October 3, 2019, C.L.L. attended a diagnostic assessment at Red Oak Behavioral Health conducted by Cynthia Smith, LPCC-S and Jeri Sampson, LSW, MSW based on Ms. Loudy's referral for school-based therapy due to "anger outbursts, quick temper, emotional behavior and on and off tearfulness."  (Tr. 414, 416-17.)  Ms. Loudy reported that C.L.L. did not have a lot of issues at school but he struggled at home.  (*Id*.)  She also reported some oppositional behavior and aggressiveness and anger towards others, memory problems, and attention and hyperactivity.  (*Id*.)  She reported that C.L.L. struggled with sleeping, anxiety, and

nervousness.  (*Id*.)  She indicated C.L.L. had been diagnosed with ADHD in the past, but did not report taking medication.  (*Id*.)  C.L.L. reported that he liked his teacher and got along with most of his classmates.  (Tr. 415.)  He also reported that he liked his intervention specialist who helped him with his work.  (*Id*.)  He was not engaged in extracurricular activities outside of the school setting.  (*Id*.)  Examination findings were generally normal, including average demeanor and activity, clear speech, logical thought process, full affect, and cooperative behavior.  (Tr. 415-16.)  Abnormal examination findings included avoidant eye contact, an anxious mood, and impaired memory.  (*Id*.)  C.L.L. was diagnosed with ADHD from history and adjustment disorder with mixed anxiety disorder due to changes in school setting and starting therapy for the first time.  (Tr. 415, 416.)  A treatment plan was prepared by LSW Sampson on October 22, 2019, recommending six hours of therapy monthly and four hours of CPTS/TBS. (Tr. 500-06.)  No subsequent Red Oak Behavioral Health treatment records are contained in the record.

An annual Individualized Education Program (IEP) review was conducted on December 12, 2019, with an updated IEP for the period through December 11, 2020 (Tr. 444-59.)  C.L.L. was in the fourth grade and it was noted that he had a "growing sense of humor," "great skills in being kind to others," "enjoy[ed] learning new things and work[ed] well with nearly all of his peers," "enjoy[ed] spending time with his family," "enjoy[ed] math which [was] a relative strength for him," and "continue[d] to grow in confidence in all academic areas and also in his social skills."  (Tr. 445.)  Recent MAP test results from the Fall of 2019-2020 in Reading and Math suggested that C.L.L. was "significantly below grade-level in reading."  (Tr. 446.)  The IEP included several specially designed services, including direct instruction with an intervention specialist in the areas of reading decoding, reading comprehension, and written expression, preferential seating near the teacher to minimize auditory and visual distractions, breaks of not

11

more than five minutes, materials and tests read aloud, testing in small group settings, extended time on assignments and tests, use of speech to text, non-verbal cues for on-task behavior, and directions repeated.  (Tr. 451.)  The team concluded that C.L.L. "no longer need[ed] specialized instruction in math, . . . he only need[ed] to receive his accommodations."  (Tr. 446.)

After the hearing, Ms. Loudy submitted a speech and language reevaluation that post-dates the ALJ's June 16, 2020 decision.  (ECF Doc. 15 p. 5 (citing Tr. 56-61); *see also* Tr. 508.) Ms. Loudy briefly summarizes the reevaluation, but does not seek a sentence six remand for consideration of new evidence.  It is not appropriate for the Court to consider these later dated records.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (explaining that "[o]nly evidence in the record below can be considered when determining whether or not the ALJ's opinion was supported by substantial evidence" and "the only method to have new evidence considered is to ask for a sentence six remand").

### 2.      Opinion Evidence

#### i.      State Agency Reviewers

On September 10 and 27, 2018, state agency reviewing psychologist Karla Delcour, Ph.D., and state agency reviewing physician Louis Goorey, M.D., reviewed the record and opined that C.L.L. had a "less than marked" limitations in the categories: acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself.  (Tr. 65-67.)  They also opined C.L.L. had no limitations in the categories: moving about and manipulating objects and health and physical well-being.  (Tr. 66-67.)

On December 13, 2018, state agency reviewing psychologist Cindy Matyi, Ph.D., and state agency reviewing physician Bruce Mirvis, M.D., reviewed the record and opined that C.L.L. had "less than marked" limitations in the categories: acquiring and using information,

12

attending and completing tasks, interacting and relating with others, and caring for yourself.  (Tr. 71-72.)  They also opined C.L.L. had no limitations in the categories: moving about and manipulating objects or health and physical well-being.  (Tr. 72.)

### ii.   Consultative Examination Reports

#### a.  Clinical Neuropsychologist Joshua Magleby, Ph.D.

On August 23, 2018, C.L.L. attended a psychological examination with clinical neuropsychologist Joshua Magleby, Ph.D.  (Tr. 344–50.)  He was eight-years old and in third grade at the time of the evaluation.  (Tr. 346.)  C.L.L. reported that school was good the prior year, but reading was hard.  (*Id*.)  He said he had two friends but was getting teased/bullied.  (*Id*.)  On mental status examination, his behavior was cooperative but "somewhat atypical and immature," with "variable eye contact" and "somewhat limited social engagement."  (*Id*.)  Dr. Magleby noted that he "did not pick up on social cues," like when he kept his "hands in the way instead of moving them for [Dr. Magleby]."  (*Id*.)  He also impulsively reached for objects on the desk and occasionally rushed Dr. Magleby through instructions.  (*Id*.)  When Dr. Magleby was interviewing Ms. Loudy, however, he observed C.L.L. playing appropriately with toys.  (*Id*.)  He observed that C.L.L.'s use of language, verbal fluency, and ability to communicate intelligibly were "fairly normal for age expectations and not markedly impaired in any way."  (*Id*.)  He noted that C.L.L.'s "[r]esponses were often fairly detailed, and he spontaneously commented at times," but with some atypical articulation, like "'arterial' for material."  (*Id*.)

Dr. Magleby found C.L.L.'s responsiveness to environmental stimuli "normal for age expectations," and his attention and concentration functioning "fair for age level expectations," with "no noticeable evidence on mental status of marked impairment in attention."  (*Id*.)  He found C.L.L.'s listening and ability to sustain effort for a task adequate, with no significant

impairment in his ability to respond to simple directions.  (*Id*.)  He described C.L.L.'s fund of information as "somewhat below average," and indicated that his "general intelligence appeared low average to borderline."  (*Id*.)  C.L.L.'s affect and facial expressions were somewhat flat and restricted.  (Tr. 347.)  His mood was stable with no lability, anxiety, or depression.  (*Id*.)  Dr. Magleby's evaluation included WISC-V testing documenting an FSIQ of 82 (12th percentile). (Tr. 344, 347.)  Dr. Magleby diagnosed unspecified neurodevelopmental disorder and unspecified attention-deficit/hyperactivity disorder.  (Tr. 348.)

Dr. Magleby provided his opinion as to C.L.L.'s functional abilities, as follows.  His *ability to acquire and use information* was "variably intact," but with occasional articulation problems.  (Tr. 348.)  His *ability to attend to tasks* was "adequate overall on observation," but his performance on working memory measures was in the borderline range and he was observed impulsively reaching for objects and rushing Dr. Magleby through instructions.  (Tr. 348-49.)

His *ability to interact and relate to others* was "somewhat atypical and delayed on observation," with examination findings showing he was somewhat subdued and anxious, his eye contact and social engagement were somewhat atypical and limited, he was impulsive at times, and he did not pick up on social cues.  (Tr. 349.)  However, Dr. Magleby also noted that he was cooperative, his conversation was fairly age and topic appropriate, he demonstrated listening skills and was not very distracted during one-on-one conversations, and his social relations with others, including family and peers, had been "variably successful," based mainly on Ms. Loudy's reports that C.L.L. was socially "passive," "'trie[d] to interact with peers," and "seem[ed] to get along with kids with disabilities."  (*Id*.)

His *self-care abilities* were "somewhat delayed," based largely on Ms. Loudy's reports that he needed help tying his shoes, she laid out his clothes, and was not really able to participate

in organization of activities without assistance.  (*Id.*)   However, Dr. Magleby added that his awareness and ability to communicate his wants and needs was "fairly intact" and behaviors such as temper outbursts, frustration, or sadness were "fairly normal for age expectations and typically short-lived, without aggressiveness or violence towards others."  (*Id.*)

### b.   Speech-Language Pathologist Anne Maholm, CCC-SLP

On August 30, 2018, speech-language pathologist Anne Maholm, CCC-SLP completed a Speech/Language Questionnaire.[2]  (Tr. 353-55.)  SLP Maholm indicated that C.L.L. "never" or "rarely" had difficulty in multiple areas of speech and language functioning, and had difficulty "sometimes" in the following three areas: saying single words clearly, producing conversational speech that is easily understood, and repeating a sentence accurately.  (Tr. 353-54.)  She indicated that C.L.L. exhibited sound errors or phonological patterns not typical for his age, but that his conversational speech could be understood by both a familiar and unfamiliar listener ninety percent of the time on the first attempt.  (Tr. 353.)  Additionally, she indicated that C.L.L.'s speech was audible "half or more of the time" at conversational distances on the first attempt.  (Tr. 354.)  When asked to describe how C.L.L.'s speech or language disorder affected his social skill development and academic development, SLP Maholm stated that he had "mildly delayed articulation skills" that might negatively impact his ability to communicate effectively in social environments or with teachers in an educational setting.  (Tr. 355.)

### c.   Speech-Language Pathologist Melanie Umlauf, M.A., CCC-SLP

On September 18, 2018, C.L.L. appeared for a speech and language evaluation at Community Speech Services conducted by speech-language pathologist Melanie Umlauf, M.A., CCC-SLP.  (Tr. 360–62.)   Ms. Loudy reported that C.L.L. did not interact well with peers at

---

[2] The questionnaire has a typed date of June 20, 2018 at the top of the first page, but it is signed by SLP Maholm on August 30, 2018.  (Tr. 353, 355.)

times, explaining he was beat up at school the prior week.  (Tr. 360.)  Ms. Loudy reported she

handled the incident with the school and SLP Umlauf noted that C.L.L. had visible bruising on

his face.  (*Id*.)  Ms. Loudy reported that C.L.L. was on an IEP and was enrolled in speech and

language therapy at Akron Children's and had made adequate progress.  (*Id*.)  SLP Umlauf noted

that C.L.L. was cooperative and pleasant, but was constantly fidgeting in his chair.  (Tr. 361.)

Based on her assessment, SLP Umlauf concluded that C.L.L. had a moderate-severe disorder

with expressive language, a mild disorder with pragmatic social skills, and normal

articulation/phonological, receptive language, voice, and fluency skills.  (Tr. 361-62.)

### iii.    Teacher Opinion

On November 18, 2018, C.L.L.'s teacher Carrie Musci completed a Teacher Questionnaire.

(Tr. 207-16.)  At the time of completion, she reported knowing CLL for four months, and teaching

him five days a week, all day, in the subjects of math, reading, writing, science, social studies, and

health. (Tr. 209.)   Ms. Musci rated C.L.L.'s functional abilities in various domains, reporting that

she observed no problems in the followings domains: Acquiring and Using Information, Attending

and Completing Tasks, and Moving About and Manipulating Objects.  (Tr. 210-11, 213.)  Ms. Musci

reported that C.L.L. demonstrated problems in the domains of Interacting and Relating with Others

and Caring for Himself.  (Tr. 213-13, 214.)

In the domain of Interacting and Relating with Others, Ms. Musci explained that she

observed a "slight" problem with "seeking attention appropriately," and a "serious problem" with

"expressing anger appropriately."  (Tr. 212.)  She reported no problems in eleven other areas within

the domain of Interacting and Relating with Others and indicated that it had not been necessary to

implement behavior modification strategies.  (*Id*.)  She reported that C.L.L.'s speech could be

understood all of the time on the first attempt by a familiar listener.  (Tr. 213.)

In the domain of Caring for Himself, Ms. Musci explained that she observed a "slight problem" with "identifying and appropriately asserting emotional needs," "responding appropriately to changes in own mood," and "knowing when to ask for help," and observed an "obvious problem" with "handling frustration appropriately." (Tr. 214.)  She reported no problems in six other areas within the domain of Caring for Himself. (*Id*.)

## C.    Ms. Loudy's Function Reports

Ms. Loudy completed two Function Reports. (Tr. 163-71, 175-84.)  In the first report, completed on June 19, 2018, Ms. Loudy reported that C.L.L. had some problems in his ability to communicate, progress in learning, engage in physical activities, and interact with others, but no problems with hearing, seeing, talking clearly, caring for himself or taking care of his personal needs, or paying attention and sticking with a task. (Tr. 163-71.)

In the second report, completed on July 4, 2018, Ms. Loudy again reported that C.L.L. had no problems with hearing, but that he had some problems with seeing and talking clearly, and problems in his ability to communicate, progress in learning, engage in physical activities, interact with others, care for himself or take care of his personal needs, and pay attention and stick with a task. (Tr. 175-84.)  She reported he had been receiving speech therapy for three or four years, had no friends, had an IEP, was behind in reading and writing, was very emotional, and had short term memory loss, A.D.D., and learning disabilities, (Tr. 177-79, 182-83.)

## D.    Hearing Testimony

Both Ms. Loudy and C.L.L. testified at the January 9, 2020 hearing.  During Ms. Loudy's testimony, C.L.L. waited outside. (Tr. 30.)

### 1.    Child's Testimony

C.L.L. testified that he was nine years old and in fourth grade. (Tr. 28.)  School was good, and he did not take homework home. (*Id*.)  When asked about his favorite part of school,

he stated: "The challenges are getting harder.  And they're to my level of math."  (*Id*.)  He played

board and video games with family and played outside with friends in the neighborhood.  (Tr.

29.)  He had friends at school and sometimes saw them outside of school.  (Tr. 30.)  When with

friends, he ran around and played games.  (Tr. 29, 30.)  He was able to clean his room and

perform chores, like fold towels.  (Tr. 29-30.)  He went to the store with his grandma at times,

and his family went out to eat on occasion.  (Tr. 30.)

### 2.     Plaintiff's Testimony

Ms. Loudy testified that C.L.L. was born in 2010 and was in fourth grade.  (Tr. 31.)  She

had custody of him since he was born.  (*Id*.)  She reported that C.L.L. attended school at the I

Promise School, which she understood was a school for kids with identified learning disabilities

or kids who were at risk.  (Tr. 32.)  It was his second year at the school and he had an IEP.  (*Id*.)

She explained that the IEP included provisions for additional time to complete items, small

group instruction, having materials read to him, a special reading teacher, and intervention

specialist.  (Tr. 32-33.)  He received speech therapy services through the school, in addition to

speech and occupational therapy through Akron Children's.  (Tr. 33, 44-45.)  While C.L.L. did

not have homework, Ms. Loudy stated she tried to read to him and found he had a short attention

span and some hyperactivity.  (Tr. 33, 35-36.)

Ms. Loudy reported that C.L.L. had no friends from school that he saw outside of school

other than one student who he would see when he was at speech therapy.  (Tr. 39.)  She also

reported that he had no friends at home other than his sister and cousin.  (*Id*.)  He sometimes

played well with his sister and cousin, but other times he did not.  (Tr. 31, 38-39.)  She reported

that C.L.L. had been bullied severely, noting at least seven instances of bullying during his first

year at the school.  (Tr. 37.)  She explained he was "a low-key child" who "kept to himself."

(*Id*.)  She stated he was "taunted and teased quite often" in school and on the bus. (Tr. 37, 40.)
She addressed it with the school and the aggressors were disciplined, but it continued.  (Tr. 37.)
She would try to talk to the bus driver and give C.L.L. a break from the bus at times until things
were sorted out.  (Tr. 40-41.)  She started C.L.L. in therapy so he could have someone to talk to
regarding his "hostility and his anger and his sadness or his -- whatever his issues are . . .
[b]ecause he would, he would go and clam up and then he would just sit there and cry."  (Tr. 38.)
She reported having been called to C.L.L.'s school several times because he was "so upset and
frustrated that he couldn't express his, his feelings."  (*Id*.)

    Ms. Loudy explained that on several days each week, C.L.L. did not get home from
taking the school bus until 6:00 p.m. so he was usually tired.  (Tr. 40-41.)  After getting home, he
played videogames and they ate dinner.  (Tr. 41.)  She stated he was not very good at keeping his
room straightened and she assigned him the chore of folding towels, but he often did not stay on
top of keeping up with folding them.  (Tr. 46.)  She reported that C.L.L. had problems getting to
sleep because his mind raced and he was restless and anxious, which sometimes created issues
waking him up.  (Tr. 42-43.)  C.L.L. had nightmares three or four times each month.  (Tr. 43.)
Ms. Loudy explained that C.L.L. had some traumatic family events occur during his life, which
were difficult for him to deal with.  (Tr. 46-47.)  Ms. Loudy often dressed C.L.L. in his sleep and
he would fall back asleep on the couch and then sleep again in the van on the way to school.  (Tr.
42.)  Although they had been working with his therapist, Ms. Loudy reported that they had not
yet tried medication for his ADHD because he had multiple disorders, explaining that he had
depression and ADHD and they could not mix depression medication with hyperactivity
medication.  (Tr. 41-42, 46-47.)  She was also concerned about starting him on medication
because he was still developing.  (Tr. 42.)

19

### III. Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered disabled ... if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  To qualify, a child recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's disability claims. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the step three determination that a child "meets" a listing, the child's impairment must be substantiated by medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d).  Alternately, to make a step three determination that a child "medically equals" a listing, the child's impairment must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a).  Finally, to make a step three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  The relevant six domains of functioning to be considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

20

with others; (4) moving about and manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

## IV. The ALJ's Decision

In his June 16, 2020, decision the ALJ made the following findings:[3]

1. The claimant was born in 2010. Therefore, he was a school-age child on May 21, 2018, the date application was filed, and currently a school-age child.  (Tr. 10.)

2. The claimant has not engaged in substantial gainful activity since May 21, 2018, the application date.  (*Id*.)

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD), learning disorder (dysgraphia), speech and language impairment, and asthma.  (*Id*.)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id*.)

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.  (Tr. 10-16.)

6. The claimant has not been disabled, as defined in the Social Security Act, since May 21, 2018, the date the application was filed.  (Tr. 16.)

## V. Plaintiff's Arguments

Ms. Loudy challenges the constitutional authority of the Commissioner to decide the case, and raises substantive objections to his decision as follows:

1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.  (ECF Doc. 15 pp. 1, 8-10, ECF Doc. 19, pp. 2-9.)

2. The ALJ erred when he found that C.L.L. did not have at least two marked limitations needed to satisfy either Listing 112.11 and/or to functionally equal the Listings.  (ECF Doc. 15 pp. 2, 10-20, ECF Doc. 19 pp. 1-2.)

---

[3] The ALJ's findings are summarized.

## VI. Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions unless it determines that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'")

(quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error.").  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether Ms. Loudy Has Standing to Challenge ALJ Decision Based on Alleged Separation of Powers Violation by the Commissioner**

Ms. Loudy argues that the ALJ decision here is "constitutionally defective" because the appointment of the former Commissioner of Social Security violated separation of powers principles.  (ECF Doc. 14 pp. 1, 7-9; ECF Doc. 17 pp. 2-7.)  Specifically, she argues based on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020) that the statute under which the former Commissioner was appointed violated separation of powers principles by allowing him to serve a longer term than the President of the United States while protecting him from removal except for cause, similar to the statute found unconstitutional in *Seila Law*.  (ECF Doc. 15 pp. 8-10 (challenging 42 U.S.C. § 902(a)(3)).)  Ms. Loudy argues based on this precedent that the ALJ's authority to issue the decision in this case

23

was "constitutionally defective" because his authority was delegated from the Commissioner, and because the ALJ's decision was improperly based on regulations promulgated by the former Commissioner without authority.  (ECF Doc. 15 pp. 1, 8-10, ECF Doc. 19, pp. 2-9.)

The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause" (ECF Doc. 17-1 p. 11 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)), but argues that Ms. Loudy is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm." (*Id.* (citing *Collins v. Yellen*, ⸺ U.S. ⸺, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).)  More specifically, the Commissioner argues that Ms. Loudy cannot show harm to support her claim for relief because the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the challenged removal restriction, and because Ms. Loudy cannot show that the removal restriction caused the denial of benefits for C.L.L.  (ECF Doc. 17-1 p. 12.)

Having considered the arguments of the parties and the applicable law, the undersigned agrees with numerous other courts that Ms. Loudys's constitutional challenge to a statutory removal provision for the Commissioner of Social Security suffers from a fundamental deficiency in this individual Social Security disability appeal, namely that Ms. Loudy lacks standing to assert the challenge.[4]  *See Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d ---,

---

[4] The Commissioner also argues that Ms. Loudy's request for relief under *Seila Law* fails under other legal and equitable doctrines, including harmless error, de facto officer, the rule of necessity, and broad prudential considerations.  (ECF Doc. 17-1 pp. 18-22.)  Because the undersigned concludes that this Court does not have standing to hear the relevant constitutional arguments, these additional arguments will not be addressed herein.

2021 WL 5882671, at *10 (N.D. Ohio Dec. 13, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, No. 3:20-CV-05602-TLF, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No. 20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*, No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No. 21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

Standing is a threshold issue, and a failure to establish standing means a court cannot address the merits of a claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case.") Although the Commissioner did not directly challenge Ms. Loudy's standing in this case, this Court has the ability and the obligation to raise the issue of standing *sua sponte* where it is in doubt. *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*."). Indeed, "[a]s a jurisdictional requirement, standing ... cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, —— U.S. ——, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019). Moreover, it is noted that the primary defect challenged by the Commissioner in her briefing – that Ms. Loudy did not suffer actual harm caused by the statutory removal provision – is also a key element of the standing analysis discussed herein. (ECF Doc. 17-1 pp. 15-18.) *See also Rhouma*, 2021 WL 5882671, at *10 (raising standing *sua sponte* when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not established a 'nexus' between § 902(a)(3)'s removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, Ms. Loudy must satisfy a three-pronged test to establish Article III standing, namely: "[he] must show that [he] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021). Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [he] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void." 141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779 (finding standing to challenge statutory removal protection for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 ("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and internal quotation marks omitted))).   However, the Court explicitly clarified that this "holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone." 141 S. Ct. at 1788, n. 24.

As the party invoking federal jurisdiction in this case, Ms. Loudy bears the burden of establishing standing for each claim and form of relief.  *See Loren*, 505 F.3d at 607 (citing *Lujan*, 504 U.S. at 561); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S. Ct. 1854, 1867, 164 L. Ed. 2d 589 (2006).  Ms. Loudy argues that the requirements for standing are met because the Commissioner did not argue otherwise, and for the reasons set forth in two district court cases

addressing similar constitutional challenges.  (ECF Doc. 19 p. 3 (citing *Brinkman v. Kijakazi*, No.  2:21-CV-00528-EJY, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-CV-076-M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), *report and recommendation adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021).)  Given that standing cannot be waived or forfeited, the pertinent question is whether Ms. Loudy has successfully demonstrated that the "traceability" requirement is met in this case.

The court in *Brinkman* did face a similar challenge to an ALJ decision based on the alleged unconstitutionality of the statutory removal provision for the Commissioner of Social Security under *Seila Law*.  2021 WL 4462897, at *1.  And contrary to the argument offered by Ms. Loudy in this case, the *Brinkman* court held: "Plaintiff cannot establish traceability. Because Plaintiff cannot demonstrate traceability, she lacks standing to bring her constitutional challenge."  *Id.* at 2 (emphasis added).  Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing."  *Id.* (citing *Seila Law*, 140 S. Ct. at 2196 and *Collins*, 141 S.Ct. at 1779).  This case clearly does not support a finding that Ms. Loudy has demonstrated standing to pursue the asserted constitutional claim in this case.

In contrast, the court in *Sylvia* found that the "traceability" requirement was met for a similar challenge "[b]ecause the ALJ derives authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3.  In so finding, the court relied in part on another court's observation that "[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate."  *Id.* (quoting *Tafoya v. Kijakazi*, No.

27

21-CV-00871-REB, 551 F.Supp.3d 1054, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)).

Indeed, the *Tafoya* court went on to state: "Under those conditions, the ALJs themselves ostensibly are operating without constitutional authority, and their disability determinations – which again, are the decisions of the Commissioner – arguably are null." *Tafoya*, 551 F. Supp. 3d at 1061.

Consistent with the findings in *Sylvia* and *Tafoya*, Ms. Loudy asserts that the ALJ decision here was "constitutionally defective" because the ALJ's authority was delegated by the Commissioner.  (ECF Doc. 15 p. 9; ECF Doc. 19 p. 2.)  In other words, she contends that the ALJ lacked authority to issue the present decision because the Commissioner lacked the ability to delegate that authority to her.  However, such a finding is in direct conflict with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S. Ct. at 2207-2211).  The *Collins* Court explained because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer, but "there was no constitutional defect in the statutorily prescribed method of appointment to that office," there was accordingly "no reason to regard any of the actions taken by the [agency] … as void." *Id.* at 1787 (emphasis in original).  In so finding, the Court distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," including the holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id.* at 1788 (citations omitted).  Thus, the Court distinguished the impact of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.

Based on the Supreme Court's explicit findings in *Collins*, there is no legal basis for the undersigned to conclude that actions of the SSA Commissioner or the ALJ in this case were automatically void or lacking in authority.  Thus, the determination must return to the question whether C.L.L. was "harmed by an action that was taken by [the SSA Commissioner] and that [Ms. Loudy] alleges was void." *Collins*, 141 S. Ct. at 1788, n. 24.  In addition to arguing that the ALJ lacked delegated authority to issue his decision, Ms. Loudy asserts that the ALJ decided this case "based on regulations promulgated by Mr. Saul when he had no authority to issue the same," and more specifically that the former Commissioner "implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)." (ECF Doc. 15 p. 9; ECF Doc. 19 p. 6.)

First, Ms. Loudy's arguments on this point are underdeveloped, as she has given no argument or explanation as to how the identified actions by the Commissioner are traceable to any harm suffered in the present case.  To demonstrate standing, Ms. Loudy must show that the policy and/or regulatory changes implemented by the former Commissioner adversely affected C.L.L. *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way.").  Second, even a cursory review of the action of the former Commissioner identified by Ms. Loudy reflects that that action is not traceable to harm asserted by Ms. Loudy in this case.  The identified change to HALLEX, an internal procedural manual for the Social Security Administration, pertains to the way that Office of Hearings Operations staff will respond when a notice of hearing acknowledgement is not returned. *See* HALLEX I-2-3-20.[5]

---

[5] The February 23, 2021 revision of HALLEX I-2-3-20 "updated and clarified the action that Office of Hearings Operations (OHO) staff will take if a claimant or appointed representative does not return an acknowledgment of the notice of hearing."  Transmittal I-2-240, Soc. Sec. Admi. Office of Analytics Review and Oversight, available at https://www.ssa.gov/OP_Home/hallex/TS/tsi-2-240.html#:~:text=This%20transmittal%20amends%20section%20I-2-3-20%20of%20the%20Hearings%2C,404.938%20and%20416.1438.%20Explanation%20of%20Content%20and%20 Changes (last visited 6/3/2022).

29

No challenge is raised in this case regarding deficiencies with the notices of hearing.  Unlike the shareholders in *Collins*, whose injury – the loss of net worth in companies in which they owned shares – was directly traceable to the Federal Housing Finance Agency Director's amendment of the formula to calculate dividends, here Ms. Loudy has not demonstrated that the regulatory change she identifies impacted the denial of benefits.  *Collins*, 141 S. Ct. at 1779.

Consistent with the findings of other courts, the undersigned therefore concludes that Ms. Loudy has failed to establish that C.L.L. suffered harm traceable to an unlawful action by the former Commissioner of Social Security, and has accordingly failed to establish standing to pursue this constitutional challenge.  *See, e.g., Rhouma*,  2021 WL 5882671 at * 11 ("Without a harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to challenge the constitutionality of § 902(a)(3)."); *Catherine J.S.W.*, 2021 WL 5276522 at *8 ("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner Saul, under *Collins v. Yellin*, 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments."); *Helms*, 2021 WL 5710096 at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.").

Because the undersigned concludes that Ms. Loudy does not have standing to proceed with her separation of powers constitutional claim, the undersigned recommends that the Court deny Ms. Loudy's request for a remand based on the asserted constitutional challenge.

C.    **Second Assignment of Error: Whether Substantial Evidence Supported ALJ's Determination that C.L.L. Did Not Have Two Marked Limitations, as Needed to Meet Listing 112.11 and/or Functionally Equal the Listings**

In her second assignment of error, Ms. Loudy contends that the ALJ erred in finding that C.L.L. did not have "at least two marked limitations," as necessary to meet Listing 112.11 "and/or" functionally equal the Listings.  (ECF Doc. 15 pp. 2, 10 (emphasis added).)

With respect to the first argument, Ms. Loudy has not set forth a developed or clearly articulated challenge to the ALJ's finding that C.L.L.'s impairments did not meet Listing 112.11. While she identified the Listing and outlined related evidence (*id.* at pp. 10-14), her challenge to the analysis of functional limitations under Listing 112.11(B) was characterized as a combined analysis of "the second part of the listing <u>and/or</u> functionally equaling the Listings" (*id.* at p. 14 (emphasis added)) and articulated under the functional domains relevant only to the "functionally equals" analysis.  *Compare* Listing 112.11(B) (four domains for listings analysis) *with* 20 C.F.R. § 416.926a(b)(1) (six domains for functional equivalence analysis).  Because Ms. Loudy did not separately articulate her "meets listing" argument under the applicable Listing 112.11(B) standard, that argument is deemed waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.").[6]

With respect to the second argument, Ms. Loudy did adequately articulate her argument that C.L.L had marked limitations in at least two functional domains relevant to the ALJ's

---

[6] Even if the undersigned were to find that Ms. Loudy appropriately conflated the (notably similar) functional domains applicable to a "meets listing" and a "functionally equals listing" analysis, the analysis of Mr. Loudy's arguments under the functionally equals standard – as set forth below – nevertheless requires a finding that Ms. Loudy has not met her burden to demonstrate that the ALJ lacked substantial evidence to support his finding that C.L.L. did not have marked limitations in at least two functional domains.

finding that his impairments did not "functionally equal" the Listings.  (ECF Doc. 15 pp. 10-20,
ECF Doc. 19 pp. 1-2.)  That argument will accordingly be addressed herein.

To support a determination that C.L.L.'s impairments functionally equaled the Listings at
Step Three of the sequential analysis, the ALJ had to find that the impairments were "of listing-
level severity," meaning that they would "result in 'marked' limitations in two domains of
functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  The regulations
further provided that the evaluation should include "information from [C.L.L.'s] parents and
teachers, and … from others who see [him] often and can describe [his] functioning at home, in
childcare, at school, and in [his] community."  20 C.F.R. § 416.926a(b)(3).

The relevant six domains of functioning are: (1) acquiring and using information; (2)
attending and completing tasks; (3) interacting and relating with others; (4) moving about and
manipulating objects; (5) caring for herself/himself; and (6) health and physical well-being. 20
C.F.R. § 416.926a(b)(1)(i)-(vi).  A "marked limitation" means that a claimant's "impairment(s)
interferes seriously with [his] ability to independently initiate, sustain, or complete activities"
and "also means a limitation that is 'more than moderate' but 'less than extreme.'"  20 C.F.R. §
416.926a(e)(2)(i).   An "extreme limitation" means that a claimant's "impairment(s) interferes
very seriously with [his] ability to independently initiate, sustain, or complete activities" and
"also means a limitation that is 'more than marked.'"  20 C.F.R. § 416.926a(e)(3)(i).

Ms. Loudy argues that the ALJ erred in not finding marked limitations in at least two of
the following domains: acquiring and using information, attending and completing tasks,
interacting and relating with others, and caring for yourself.[7]  (ECF Doc. 15 pp. 15-19.)  The
ALJ held instead that he had less-than-marked limitations in all domains.  (Tr. 11, 13-14.)   Ms.

---

[7] Ms. Loudy does not challenge the ALJ's finding that C.L.L. had less than marked limitations in moving about and
manipulating objects or health and physical well-being.  Thus, those findings are accordingly not addressed herein.

Loudy first argues that the ALJ's analysis is faulty because the ALJ failed to follow the "whole child" approach and "the decision in this matter appears to be the template for adult decisions as there was no analysis of each of the functional domains." (ECF Doc. 15 pp. 14-15.)  She then raises more specific challenges to the ALJ's findings that C.L.L. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself.  (*Id*. at pp. 15-20, ECF Doc. 19 pp. 1-2.)  Each argument is addressed separately below.

     **1.**      **Whether ALJ Failed to Analyze "Whole Child" and All Functional Domains**

Even a cursory review of the ALJ decision confirms that Ms. Loudy's argument that the ALJ failed to follow the "whole child" approach and provided "no analysis of each of the functional domains," (ECF Doc. 15 pp. 14-15), is without merit.

Functional equivalence requires a finding that the claimant's impairments "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  As explained in Social Security Ruling 09-1p, the technique for determining functional equivalence in a child disability case, known as the "whole child" approach, "accounts for all of the effects of a child's impairments singly and in combination—the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings."  SSR 09-1p, 74 Fed. Reg. 7527, 7528 (Feb. 17, 2009); *see also* 20 C.F.R. 416.926a (functional equivalence for children).  The whole child approach involves a comparison of how the child is functioning in relationship to his or her peers.  SSR 09-1p, 74 Fed. Reg. at 7528 (stating functional equivalence requires consideration of "how the child functions every day and in all settings compared to other children the same age who do not have impairments.").  Assessing functional equivalence for children also involves an analysis of how

33

the child "function[s] in [his] activities in terms of six domains."  20 C.F.R. § 416.926a(b)(1)(i)-(iv); SSR 09-1p, 74 Fed. Reg. at 7258.

Here, the ALJ acknowledged the need to evaluate how C.L.L. performed activities as compared to other children his same age who do not have impairments, (Tr. 11), and assessed his functional equivalence by evaluating how he functioned in each of the six domains (Tr. 11-14). Because Ms. Loudy's assertion that the ALJ failed to apply the "whole child" approach for assessing C.L.L.'s functional equivalence is plainly without merit, the undersigned turns next to Ms. Loudy's arguments regarding the domains of acquiring and using information, attending and completing tasks, interacting and relating to others, and caring for yourself.

### 2.    Acquiring and Using Information

When evaluating the domain *acquiring and using information*, an ALJ should consider how well the child "acquire[s] or learn[s] information, and how well [the child] use[s] the information [he] [has] learned.  20 C.F.R. § 416.926a(g).  The regulations provide that a school-age-child "should be able to learn to read, write, and do math, and discuss history and science . . . [and] should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others."  20 C.F.R. 416.926a(g)(2)(iv).

Ms. Loudy asserts that the ALJ 's decision was not supported by substantial evidence when he found that C.L.L. had "less than marked" limitations in *acquiring and using information* because the evidence "supported a finding that C.L.L. had a marked limitation in this functional domain."  (ECF Doc. 15 p. 16.)  In support, she appears to argue first that the ALJ based his decision on a misreading of a 2019 IEP, then points out that C.L.L. was receiving special

education services and that related testing suggested he was functioning below grade level in

several measures.  (*Id.* at pp. 15-16 (citing Tr. 245-46, 445).)

With respect to C.L.L.'s IEPs and related educational testing results, the ALJ made the

following detailed observations:

> The claimant has an IEP. (13E: 15E; 16E; 9F: 10F) During third grade, between
> May and August 2018, the claimant had a MAP testing score of 157. Scores
> between 151-170 indicate a <u>first grade</u> reading level. (13E/15) He was ready to
> learn second grade sight words. Vocabulary was at the <u>second grade</u> level.
> Comprehension for literature was at the <u>first grade</u> level, and comprehension for
> information text was at the <u>second grade</u> level. Phonics was at a <u>kindergarten</u> level.
> (13E/2-3, 13-16) By December 2018, the claimant had a MAP score of 175. March
> 2019, the claimant's MAP score rose to 181, which the evaluator described as <u>third
> grade</u> reading level. (13E/16) The claimant's IEP provided assistance with
> vocabulary fluency and comprehension three times per week for 20 minutes each
> session. Sub-scores in this area ranged from <u>kindergarten</u> to <u>second grade</u>. The
> claimant had information read aloud for 10 minutes daily. He had mini-lessons and
> small group instruction for 20 minutes daily. He received assistance for reading,
> writing and comprehension on a daily basis. (13E/18-30)
>
> Updated educational records for the 2019-2020 year show improvements with
> speech therapy. The progress report in October 2019 indicated that the claimant
> was making progress in math and improved his reading from the intensive range to
> the targeted range. He was still reading at <u>below grade level</u>. He was <u>approaching
> mastery in most areas for the first grading period of 4th grade</u>. He was passing all
> classes in November 2019. His IEP for the period of December 2019 through
> December 2020 related that he had a low score on working memory suggesting that
> he had problems retaining, recalling, and repeating information. The claimant
> continued specialized instruction in reading with an emphasis on comprehension
> and decoding. (15E/7-8; 8F/1-2; 9F) His full-scale IQ score was 87, in the low
> average range. (10F/8) The IQ scores, IEP's, and teacher reports are consistent with
> less than marked limitation in using and acquiring information, attending and
> completing tasks, and caring for oneself.

(Tr. 13-14 (emphasis added).)  These findings clearly reflect that the ALJ both understood and

acknowledged that C.L.L. was receiving special education services, and that testing associated

with those services indicated he was operating below grade-level in several measures.  By way of

example, all references to below-grade-level testing are underlined in the above quotation.

As for Ms. Loudy's argument that "a careful reading of the decision indicates that the ALJ based his conclusion" on certain limitations noted in the IEP, while the IEP "actually stated" additional limitations (ECF Doc. 15 p. 15), this argument is not supported by a reading of the plain language of the ALJ decision.  First, it is well-established that the ALJ was not required to discuss every piece of evidence in order to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (holding an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion") (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  Second, the very specific conclusions drawn by Ms. Loudy as to what the ALJ did or did not consider in reviewing the IEP is simply not evident from the actual findings set forth in the ALJ decision.  Instead, a review of the IEP and test findings discussed by the ALJ reflects broad consideration of the IEP and test findings, and does not support a finding that he mischaracterized or failed consider any of the specific evidence highlighted in Ms. Loudy's brief.

After discussing the educational and medical evidence in detail, the ALJ concluded that C.L.L.'s "IQ scores, IEP's, and teacher reports are consistent with less than marked limitation in using and acquiring information."  (Tr. 14)  He then went on to consider the opinion evidence, including the opinion of consultative examiner Dr. Magleby, who found C.L.L.'s "ability to acquire and use information relative to the functioning of typically-developing children the same age was variably intact," "[l]anguage, use of language, vocabulary and ability to communicate during the examination was fairly intact overall, including fairly detailed responses in conversation as well as spontaneous commenting," "[u]nderstanding simple oral instructions as

part of today's exam was fairly intact[,]" and "[t]he ability to retain simple information on this exam was fairly intact."  (Tr. 15, 348.)

He also considered the opinion of Ms. Musci, C.L.L.'s teacher, who found no problems in acquiring or using information, concluding that her "assessment is persuasive and supportable because it is based on a trained educator who observed the claimant on a daily basis" and "[t]he academic improvements with interventions, lack of disciplinary issues, and improved MAP scores are all consistent with no more than less than marked limitations."  (Tr. 16, 210.)  Ms. Loudy's conclusory argument that "[t]he fact that the teacher did not note any . . .  difficulties [other than that C.L.L. had a serious problem in expressing anger] raises the question as to the validity of [the] questionnaire as the remaining school records document serious limitations in C.L.L.'s ability to function in school" is not well taken.  (ECF Doc. 15 p. 12.)  She has not articulated a clear substantive basis to discount the opinion, and has also failed to set forth a direct, developed, or clearly articulated challenge to the ALJ's weighing of that opinion.  Any challenge to the ALJ's persuasiveness finding relative to the opinion is accordingly deemed waived.  *McPherson*, 125 F.3d at 995–96.

Finally, the ALJ considered the opinions of the state agency reviewers, who found less than marked limitations in the domain of acquiring and using information (Tr. 66, 71), finding their opinion "persuasive and supportable, because [it] [was] consistent with good improvements in school, IQ testing, no behavioral issues, some difficulty expressing emotions/tolerating frustration, normal use of the hands in the classroom and no limits in gym class."  (Tr. 16).  These opinions provide substantial evidence in support of the ALJ's finding of less than marked limitations in the domain of *acquiring or using information*.

It is clear the ALJ sufficiently considered the record, including IEP records, C.L.L.'s low working memory score, and his below-grade level test scores, and adequately explained the basis for his decision.  It is not for this Court to consider the evidence *de novo*, and Ms. Loudy's arguments are not based on any evidence that was not considered by the ALJ.  Accordingly, the undersigned finds Ms. Loudy has not met her burden to demonstrate that the ALJ lacked the support of substantial evidence in finding that C.L.L.'s impairments caused him less than marked limitations in the domain of *acquiring or using information*.

### 3. Attending and Completing Tasks

When evaluating the domain *attending and completing tasks*, an ALJ should consider how well the child is "able to focus and maintain [his] attention, and how well [he] begin[s], carr[ies] through, and finish[es] [his] activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them. 20 C.F.R. § 416.926a(h).  The regulations provide that a school-age-child "should be able to focus [his] attention in a variety of situations in order to follow directions, remember and organize [his] school materials, and complete classroom and homework assignments[,]" "should be able to concentrate on details and not make careless mistakes in [his] work (beyond what would be expected in other children your age who do not have impairments)[,]" "should be able to change [his] activities or routines without distracting [himself] or others, and stay on task and in place when appropriate[,]" "should be able to sustain [his] attention well enough to participate in group sports, read by [himself], and complete family chores," and "should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation."  20 C.F.R. 416.926a(h)(2)(iv).

Ms. Loudy argues that substantial evidence did not support the ALJ's determination that C.L.L. had less than marked limitations in *attending and completing tasks* because "the school records documented that C.L.L. was seriously limited in his ability to independently initiate, sustain or complete activities in this domain."  (ECF Doc. 15 p. 16.)  In support, she primarily incorporates her prior arguments from the discussion above, which will not be revisited here. However, she also asserts that the evidence supported a finding that C.L.L. had marked limitations in the *attending and completing tasks* domain because of instructions in his 2019 IEP that "he was to be given instructions slowly one at a time."  (*Id*. (citing Tr. 445).)

As with the prior domain, the ALJ concluded after discussing the educational and medical evidence in detail that C.L.L.'s "IQ scores, IEP's, and teacher reports are consistent with less than marked limitation in . . . attending and completing tasks."  (Tr. 14.)  In so finding, he again considered the opinion evidence, including Dr. Magleby's findings that:

> [C.L.L.'s] ability to attend to tasks relative to the functioning of typically developing children the same age was adequate overall on observation. [C.L.L.] was able to pay attention during the exam and respond to direct questions, not requiring significant repetitions. Ability to complete the tasks required on this exam, including mental status and standardized testing, was not overtly impaired by attention problems. However, his performance on WISC-V working memory measures was in the borderline range and [C.L.L.] was observed impulsively reaching for objects on the desk as well as rushing this examiner through instructions at times…

(Tr. 15 (citing Tr. 348-49).)  The ALJ also considered the opinion of his teacher Ms. Musci, who noted no problems in attending and completing tasks, again finding her "assessment is persuasive and supportable because it is based on a trained educator who observed the claimant on a daily basis," and "[t]he academic improvements with interventions, lack of disciplinary issues, and improved MAP scores are all consistent with no more than less than marked limitations."  (Tr. 16, 211.)  As part of the ETR reevaluation conducted in December 2018, it is noted that Ms.

Musci also completed an evaluation indicating that C.L.L.'s attention span and focus were age appropriate, he was able to understand and follow teacher directives, and he could complete academic tasks at current grade level.  (Tr. 461, 489.)  She noted that C.L.L. did "not need anything repeated [and] he always follow[ed] directions the first time."  (Tr. 489.)

The ALJ also considered the opinions of the state agency reviewers who found less than marked limitations in the domain of attending and completing tasks based on their review of the records (Tr. 66, 71), again finding their opinions "persuasive and supportable, because they are consistent with good improvements in school, IQ testing, no behavioral issues, some difficulty expressing emotions/tolerating frustration, normal use of the hands in the classroom and no limits in gym class."  (Tr. 16).  The record evidence and opinions cited by the ALJ provide substantial evidence to support the ALJ's finding of less than marked limitations in *attending and completing tasks*.

Ms. Loudy points to a single instruction in C.L.L.'s 2019 IEP, a recommendation that he be given instructions "slowly one at a time," as evidence that the ALJ erred in finding less than marked limitations in *attending and completing tasks*.  (ECF Doc. 15 p. 16 (citing Tr. 445).)  While the ALJ did not specifically recite and consider this instruction in his decision, he did acknowledge that IEP accommodations included "assistance with vocabulary fluency and comprehension three times per week," having "information read aloud for 10 minutes daily," "mini-lessons and small group instruction for 20 minutes daily," and "assistance for reading, writing and comprehension on a daily basis."  (Tr. 13-14.)  It is again noted that the ALJ was not required to specifically discuss every piece of evidence in order to render a decision supported by substantial evidence.  *See Boseley*, 397 F. App'x at 199 (citing *Kornecky*, 167 F. App'x at 507–08).  In the context of the ALJ's discussion of the record as a whole, including his detailed

discussion of the IEP that is the source of the single instruction identified by Ms. Loudy, the failure to discuss this particular instruction was neither misleading nor a material omission.

For all of the reasons stated, it is clear the ALJ sufficiently considered the record and adequately explained his decision with respect to this functional domain. Ms. Loudy points to no evidence that was not considered by the ALJ, and she has not met her burden to demonstrate that the ALJ lacked substantial evidence to support his finding that C.L.L.'s impairments caused less than marked limitations in *attending and completing tasks*.

### 4.    Interacting and Relating to Others

When evaluating the domain *interacting and relating to others*, an ALJ should consider how well the child is able to "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations further provide that a school-age-child "should be able to develop more lasting friendships with children who are [his] age," "should begin to understand how to work in groups to create projects and solve problems," "should have an increasing ability to understand another's point of view and to tolerate differences," and "should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand." 20 C.F.R. 416.926a(i)(2)(iv).

Ms. Loudy asserts that the ALJ lacked substantial evidence to support his finding that C.L.L. had less than marked limitations in the domain *interacting and relating with others*, arguing that the following evidence supports a finding of marked limitations:

> During the consultative examination Dr. Magleby observed that C.L.L.'s behavior was atypical and immature with variable eye contact and somewhat limited social engagement (Tr. 346). C.L.L. demonstrated flat and restricted facial expressions (Tr. 347). His ability to get along with others seemed delayed and his social skills

41

were atypical (*Id.*). Functionally, it was noted that C.L.L. was atypical and delayed in his ability to interact and relate with others (Tr. 349). A speech and language evaluation was completed on September 18, 2018 (Tr. 360-362). C.L.L.'s specific language tasks revealed that his receptive language skills are average with a significantly lower expressive language subtest score. He had difficulty using irregular past tense verbs and using comparatives. It was revealed that his expressive language skills were moderately to severely disordered. It was concluded that C.L.L. had a moderate to severe disorder with expressive language (Tr. 362). …[8] During the hearing, his grandmother testified that C.L.L. was being bullied at school (Tr. 37-38) and he did not see kids outside of school except one whom he saw at speech therapy (Tr. 39). When the grandmother completed the Function Report in July 2018, she reported that he had no friend (Tr. 178).

(ECF Doc. 15 pp. 17-18.) While she argues this evidence supports marked limitations, Ms. Loudy does not specifically contend that the ALJ mischaracterized or ignored the cited evidence. A review of the ALJ decision as a whole also does not substantiate such a finding.

The ALJ provided the following explanation in support of his finding that C.L.L. had less than marked limitations in *interacting and relating to others*:

> There were no disciplinary issues at school. (16E) On the bus, the claimant remained [in]his seat, used appropriate voice level, and kept his hands, feet and objects to himself. (15E/8) Educational records indicate the claimant "enjoys school and gets along very well with his classmates. He also enjoys learning new things." (9F/1) During the fourth grade, for the school year 2019-2020, a teacher noted, "Cameron is a phenomenal student! He works [s]o hard every day and his hard work shows with his grades. Cameron needs to continue to work on Perseverance when he gets frustrated because he sometimes shuts down. However, this is a pretty rare occasion and most of the time, he demonstrates his exceptional ability take a Perpetual Learner." (15E/8) This evidence and records showing good progress in speech therapy are consistent with less than marked limitations in interacting and relating to others.

(Tr. 14 (citing Tr. 284, 285, 444).) When making those findings, the ALJ had already discussed the 2018 speech and language evaluation highlighted in Ms. Loudy's brief, including SLP Umlauf's observations that C.L.L.'s expressive language was "moderately-to severely disordered," but with a mild disorder in pragmatic language, numerous other measures within

---

[8] Ms. Loudy's discussion of evidence that was submitted after the ALJ decision was issued in this case is neither quoted nor considered here, for the reasons set forth in Section II.B.1. *See Bass*, 499 F.3d at 513.

normal limits, and "essentially normal articulation skills for his age." (Tr. 13.) He had also

acknowledged Ms. Loudy's testimony that he was bullied at school. (Tr. 12.)

The ALJ went on to discuss Dr. Magleby's objective observations during the consultative

examination, as highlighted in Ms. Loudy's brief, including the following:

> The claimant was casually dressed, with fair grooming and hygiene. He seemed
> physically healthy. He separated easily from his grandmother in the waiting room.
> On mental status exam, he was alert and oriented. Behavior was cooperative, but
> seemed somewhat atypical and immature. The claimant variable eye contact and
> demonstrated somewhat limited social engagement. He did not seem to pick up on
> social cues (e.g., keeping hands in the way instead of moving them for the
> examiner). He impulsively reached for objects on the desk. On occasion, he rushed
> the examiner through instructions ("I get it, I get it"). During the interview with his
> grandmother, he played appropriately with toys. Language, use of language, such
> as syntax, verbal fluency, and the ability to communicate intelligibly appeared
> fairly normal for age expectations and not markedly impaired in any way.
> Responses were often fairly detailed, and he spontaneously commented at times.
> However, some atypical articulation was heard (e.g., "arterial" for material).

(Tr. 14-15 (citing Tr. 344-52).) The ALJ also considered Dr. Magleby's opinion and

observations that:

> The claimant's ability to interact and relate to others relative to the functioning of
> typically-developing children of the same age is somewhat atypical and delayed on
> observation. Cameron was cooperative throughout but somewhat subdued and
> perhaps anxious….His eye contact and social engagement were somewhat atypical
> and limited. He was also impulsive at times in his interactions with this
> examiner….Conversation was fairly age appropriate and topic appropriate.
> Cameron demonstrates listening skills and was not highly distracted during
> conversations, one to one, with this examiner. Social relations with others such as
> family and peers have been variably successful based in large part of the
> grandmother's claim that socially Cameron 'is passive,' 'tries' to interact with
> peers, and 'seems to get along with kids with disabilities.' Disruptive behaviors,
> such as defiance, direct oppositionalism, or negative reaction to direction or
> redirection were not reported per as though Cameron reportedly has some negative
> reactions to change/transition.

(Tr. 15; *see also* Tr. 346-47, 349.) He found Dr. Magleby's opinion "persuasive and supportable

because it is consistent with specific examples and the lack of significant mental health

treatment." (Tr. 16.)

The ALJ also considered Ms. Musci's opinion regarding C.L.L.'s functioning in this domain.  (Tr. 16, 212.)  Ms. Musci reported a slight problem in C.L.L.'s ability to seek attention appropriately and a serious problem in expressing anger appropriately.  (Tr. 212.)  She reported no problems in the remaining areas, including playing cooperatively with other children, making and keeping friends, asking for permission appropriately, following rules, respecting and obeying adults in authority, relating experiences and telling stories, using language appropriately to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, taking turns in conversation, interpreting facial expressions and body language, and using adequate vocabulary and grammar to express thoughts and ideas in everyday conversation.  (*Id*.)  The ALJ found Ms. Musci's opinions persuasive.  (Tr. 16.)  He also found the state agency reviewers opinions that C.L.L. had less than marked limitations in interacting with others persuasive.  (Tr. 16, 66, 72.)

Both the records and the opinions discussed by the ALJ, as set forth in further detail above, provide substantial evidence in support of the ALJ's finding that C.L.L. had less than marked limitations in *interacting and relating to others*.  The ALJ specifically discussed and considered most of the evidence highlighted by Ms. Loudy in her brief, without any evident mischaracterization or omission of material evidence.  While there is evidence of speech and language deficits and other social limitations, such as limited friendships and instances of bullying, the record shows that C.L.L. generally interacted well with others.

Considering the evidence of record as a whole, the ALJ found that the limitations in interacting and relating to others did not rise to the level of marked limitations.  The ALJ's findings in this regard are sufficiently explained and it is not for this Court to consider the evidence *de novo*.  Ms. Loudy has not met her burden to demonstrate that the ALJ lacked

substantial evidence to support his finding that C.L.L.'s impairments caused less than marked limitations in the domain of *interacting and relating with others*.

###### 5. Caring for Yourself

When evaluating the domain *caring for yourself*, an ALJ should consider how well the child is able to "maintain a healthy emotional and physical state, including how well [he] get[s] [his] physical and emotional wants and needs met in appropriate ways; how [he] cope[s] with stress and changes in [his] environment; and whether [he] take[s] care of [his] own health, possessions, and living area." 20 C.F.R. § 416.926a(k). The regulations provide that a school-age-child "should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although [he] may still need to be reminded sometimes to do these routinely," "[s]hould begin to recognize that [he] [is] competent in doing some activities and that [he] [has] difficulty with others," "[s]hould be able to identify those circumstances when [he] feel[s] good about [himself] and when [he] feel[s] bad," "[s]hould begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior,"[s]hould begin to demonstrate consistent control over [his] behavior, and [he] should be able to avoid behaviors that are unsafe or otherwise not good for [him]," and "[s]hould begin to imitate more of the behavior of adults [he] know[s]." 20 C.F.R. 416.926a(k)(2)(iv).

Ms. Loudy asserts that the ALJ lacked substantial evidence to support a finding that C.L.L. had less than marked limitations in the domain *caring for yourself*, arguing that the following evidence required a finding of marked limitations:

> C.L.L. received school-based counseling services from Red Oak. He was referred on October 3, 2019 (Tr. 414). At that time, C.L.L. presented with opposition, some aggressiveness and anger toward others, memory problems, attention and hyperactivity (*Id.*). He was recommended for weekly hour-long sessions (Tr. 505). According to the ETR, C.L.L. would handle frustration in an inappropriate manner by melting down, so he needed to increase his skills for self-regulation when upset

> (Tr. 478). Even the teacher who found no problems, indicated that C.L.L. had a
> serious problem with expressing anger appropriately (Tr. 212).

(ECF Doc. 15 p. 18.)  As in prior sections, Ms. Loudy does not argue that the ALJ ignored or

mischaracterized the evidence highlighted in her brief, instead simply arguing that this evidence

shows C.L.L. "had a marked limitation in this functional domain."  (ECF Doc. 15 p. 19.)  A

review of the ALJ decision again reflects that the relevant evidence was adequately discussed

and considered by the ALJ in making the findings that are challenged in this case.

The ALJ provided the following explanation in support of his finding that C.L.L. had less

than marked limitations in the *caring for yourself* domain, explicitly relying on and discussing

the counseling records highlighted by Ms. Loudy:

> Mental health treatment is very limited. Social workers and a counselor evaluated
> the claimant at Red Oak Behavioral Health in October 2019. The claimant wanted
> help in processing feelings and sharing more openly. The evaluator note[d] that he
> is a "good student who strives to make good choices. He likes being at school and
> gets along very well with other students and teachers." The evaluator suggested
> diagnoses of ADHD and adjustment disorder, but none of them were qualified to
> diagnose. They suggested counseling for what was described as "mild" symptoms.
> (6F/1-4; 11F/2-8) There is no further record of treatment after this evaluation. The
> claimant's grandmother confirmed that he does not use medication for mental
> symptoms. This evidence, and teacher reports indicating some issues handling
> emotions, is consistent with less than marked limitations in caring for oneself.

(Tr. 14 (citing Tr. 414-17, 500-06.)  The ALJ also considered the educational records in

assessing this domain, explaining that C.L.L.'s "IQ scores, IEP's, and teacher reports are

consistent with less than marked limitation in . . . caring for oneself."  (Tr. 14.)

With respect to the issues with frustration noted in Ms. Loudy's brief, the ALJ

specifically acknowledged fourth grade teacher Ms. Bonnaci's observation that C.L.L. "needs to

continue to work on Perseverance when he gets frustrated because he sometimes shuts down,"

but that "this is a pretty rare occasion and most of the time, he demonstrates his exceptional

ability take [sic] a Perpetual Learner."  (Tr. 14 (citing Tr. 284).)  He also considered opinion

evidence from Dr. Magleby, Ms. Musci, and the state agency reviewers.  (Tr. 15-16.)  He noted

that Dr. Magleby found the following with respect to C.L.L.'s self-care abilities:

> The claimant's abilities in the areas of self-care relative to the functioning of typically-developing children of the same age has been somewhat delayed based in large part on the grandmother's claim that Cameron can complete toileting and dressing without assistance but needs help with tying his shoes 'and I lay out his clothes.' and that Cameron is generally unable to participate in organization of activities without assistance 'but we're just getting into that this year.' Awareness and ability to communicate wants and needs to others have been fairly intact. Behaviors such as temper outburst, signs of frustration or sadness appear fairly normal for age expectations and typically short-lived, without aggressiveness or violence toward others."

(Tr. 15-16; *see also* Tr. 349.)  He noted that teacher Ms. Musci endorsed "no problem" in 6/10

areas relating to caring for oneself, a "slight problem" in 3/10 areas, and an "obvious problem" in

"handling frustration appropriately, with issues occurring once per month."  (Tr. 16 (citing Tr.

207-16).)  Finally, he noted that the state agency reviewers opined that C.L.L. had less than

marked limitations in caring for oneself.  (Tr. 16; *see also* Tr. 67, 72.)

While there is evidence of some limitations in the area of *caring for yourself*, the ALJ

found that the limitations in this area did not rise to the level of marked limitations.  This finding

is sufficiently explained and adequately supported by substantial evidence in the record.  Ms.

Loudy has not met her burden to demonstrate that the ALJ lacked substantial evidence to support

his finding that C.L.L.'s impairments caused less than marked limitations in the domain of

*caring for yourself*.

While Ms. Loudy argues that the evidence supports a finding of marked limitations in at

least two functional domains, "'[t]he substantial-evidence standard ... presupposes that there is a

zone of choice within which the decisionmakers can go either way, without interference by the

courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  That means that this Court

must defer to the ALJ's decision "'even if there is substantial evidence in the record that would

have supported an opposite conclusion,'" *id.* at 406, "so long as substantial evidence also supports the conclusion reached by the ALJ," *Jones*, 336 F.3d at 477.  Because this Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility," *Garner*, 745 F.2d at 387, the undersigned must conclude that Ms. Loudy has failed to meet her burden and the second assignment of error is without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

June 29, 2022

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

48